UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JERMAINE JAMAICA CAMPBELL, SR., | Case No. 3:19-cv-00576-MMD-CSD |
| Petitioner, | ORDER |
| v. | |
| WILLIAM GITTERE, *et al.*, | |
| Respondents. | |

I.    **SUMMARY**

This action is a petition for a writ of habeas corpus by Petitioner Jermaine Jamaica Campbell, Sr., an individual incarcerated at Ely State Prison, in Ely, Nevada. Campbell is represented by appointed counsel. The case is before the Court for resolution on the merits of Campbell's claims. For the reasons discussed below, the Court will deny Campbell habeas corpus relief and will deny him a certificate of appealability.

II.    **BACKGROUND**

Campbell was convicted, following a two-day jury trial, in Nevada's Second Judicial District Court (Washoe County), of two counts of trafficking in a controlled substance. (ECF Nos. 45-6, 46-2, 46-3, 46-7.) He was sentenced to two consecutive terms of life in prison with parole eligibility after ten years. (ECF No. 46-9.) The Judgment was filed on February 27, 2012. (*Id.*)

Campbell appealed. (ECF Nos. 46-10, 47-29, 47-34.) The Nevada Supreme Court affirmed on September 18, 2013. (ECF No. 47-36.) Campbell filed a petition for certiorari in the United States Supreme Court. (ECF No. 47-50.) The United States Supreme Court

denied that petition on April 28, 2014 (ECF No. 47-51) and then denied a petition for rehearing on June 30, 2014 (ECF No. 47-52).

On October 10, 2014, Campbell filed a *pro se* petition for writ of habeas corpus in the state district court. (ECF No. 48-1.) On March 25, 2016, with appointed counsel, Campbell filed a supplemental habeas petition. (ECF No. 49-14.) The state district court held an evidentiary hearing (ECF No. 50-1), then denied Campbell's petition in a written order filed on February 15, 2018. (ECF No. 50-6.) Campbell appealed. (ECF Nos. 50-2, 51-7.) The Nevada Supreme Court affirmed on July 10, 2019. (ECF No. 51-12.) The remittitur issued on August 5, 2019. (ECF No. 51-14.)

On September 15, 2020, Campbell filed a *pro se* motion for modification of sentence in the state district court. (ECF No. 51-15.) The state district court denied that motion on October 16, 2020. (ECF No. 51-21.) Campbell appealed (ECF No. 51-24), but the Nevada Supreme Court dismissed the appeal on January 8, 2021, ruling that the notice of appeal was untimely filed. (ECF No. 51-25.)

The Court received a *pro se* petition for writ of habeas corpus from Campbell, initiating this action on September 17, 2019. (ECF No. 4.) The Court granted Campbell's motion for appointment of counsel and appointed the Federal Public Defender for the District of Nevada to represent him. (ECF Nos. 3, 5.) With counsel, on September 21, 2020, Campbell filed a first amended petition for writ of habeas corpus (ECF No. 25). Campbell's first amended petition, his operative petition, includes the following claims (organized and stated as in the petition):

> Ground 1: Campbell's federal constitutional rights were violated on account of ineffective assistance of his trial counsel because "counsel induced Campbell to reject a favorable plea based upon counsel's opinion that the case would be dismissed for the State's failure to locate Ashley Loftis."
>
> Ground 2: Campbell's federal constitutional rights were violated on account of ineffective assistance of his trial counsel because counsel "fail[ed] to argue that Ms. Loftis did not voluntarily consent to sign the waiver that permitted the search of the apartment."
>
> Ground 3: Campbell's federal constitutional rights were violated on account of ineffective assistance of his trial counsel because counsel "failed to make

an *Apprendi* objection to the enhanced sentence beyond the one justified by the jury's verdict."

Ground 4: Campbell's federal constitutional rights were violated on account of ineffective assistance of his trial counsel because counsel was ineffective at sentencing.

Ground 4A: "Counsel was ineffective at sentencing by failing to make any argument on behalf of Mr. Campbell."

Ground 4B: "Counsel was ineffective at sentencing by failing to object to suspect evidence cited by the judge in imposing two life sentences."

(ECF No. 25.)

Respondents filed a motion to dismiss (ECF No. 42), contending that all of Campbell's claims are barred by the statute of limitations and that Grounds 1, 3, 4A, and 4B are unexhausted in state court and/or procedurally defaulted. The Court denied Respondents' motion. (ECF No. 64.)

Respondents then filed an answer to Campbell's amended habeas petition. (ECF No. 75.) Campbell filed a reply. (ECF No. 90.)

III.    **DISCUSSION**

A.    **AEDPA Standard of Review**

28 U.S.C. § 2254(d) (enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)) sets forth the standard of review generally applicable to claims asserted and resolved on their merits in state court:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (quotation marks and citations omitted)).

### B.     Exhaustion and Procedural Default – Legal Standards

A federal court may not grant relief on a habeas corpus claim not exhausted in state court. *See* 28 U.S.C. § 2254(b). The exhaustion doctrine is based on the policy of federal-state comity, and is designed to give state courts the initial opportunity to correct alleged constitutional deprivations. *See Picard v. Conner*, 404 U.S. 270, 275 (1971). To exhaust a claim, a petitioner must fairly present that claim to the highest available state court and must give that court the opportunity to address and resolve it. *See Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails to comply with the State's procedural requirements in presenting his claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance"). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Id.* at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice,

but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

In *Martinez v. Ryan*, the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. 566 U.S. 1, 9 (2012). In *Martinez*, the Supreme Court noted that it had previously held, in *Coleman*, that "an attorney's negligence in a postconviction proceeding does not establish cause" to excuse a procedural default. *Id.* at 15 (citing *Coleman*, 501 U.S. at 746-47). The *Martinez* Court, however, "qualif[ied] *Coleman* by recognizing a narrow exception: inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. The Court described "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 8.

### C.   Ineffective Assistance of Counsel – Legal Standards

In *Strickland v. Washington*, the Supreme Court established a two-prong test for claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance

or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See id.* at 697.

Where a state court previously adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court explained that, in such cases, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential . . . and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010) (double deference required with respect to state court adjudications of *Strickland* claims).

**D.    Claim-Specific Analysis**

**1.    Ground 1**

In Ground 1, Campbell claims that his federal constitutional rights were violated on account of ineffective assistance of his trial counsel because "counsel induced Campbell to reject a favorable plea based upon counsel's opinion that the case would be dismissed for the State's failure to locate Ashley Loftis." (ECF No. 25 at 6.) Campbell explains his claim as follows:

> Mr. Campbell was charged with two counts of Trafficking in a Controlled Substance under NRS § 453.3385(3). *See* 1/21/2011 Information [ECF No. 43-6]. If convicted after trial, he could be sentenced to either 10 to 25 years or 10 years to life on each count.
>
> Mr. Campbell was represented by John Ohlson at trial. The month before the trial was set to [begin], the prosecution sent an email to Ohlson with an offer of 6 to 15 years with no habitual criminal designation. *See* 10/10/2014 Pro Se Petition [ECF No. 48-1]. Rather than take this favorable deal, Ohlson advised Mr. Campbell to reject it, suggesting instead that Mr. Campbell proceed to trial because the State could not find Ms. Loftis and that if the State could not locate her the court would likely dismiss the charges. *See* 1/30/2018 Evidentiary Hearing ("EH") [ECF No. 50-1] at 74–75. Mr. Campbell declined the State's offer and chose to go to trial based on this advice.
>
> Mr. Campbell was subsequently convicted after trial of both counts of third-level trafficking and sentenced to consecutive terms of 10 years to life. *See* 2/27/2012 Judgment [ECF No. 46-9].

1   (*Id.* at 6-7.)

2        Campbell asserted this claim in state court in Ground 9 of his state habeas petition.

3   (ECF No. 49-14 at 10-11.) The state district court held an evidentiary hearing. (ECF No.

4   50-1 (Transcript).) Ohlson testified as follows:

5        Q. [direct examination]    After you lost the motion to suppress, did
    you ever tell Mr. Campbell that you could go to—you needed to go to trial
6   because you'd win at trial, specifically because Ms. Loftis was unavailable?

7        A.    Well, that's a number of questions. The first is, I never tell a
    client to go to trial. I advise the client in regards to trial. They make the
8   decision.

9        Q.    Okay. Do you remember what you advised Mr. Campbell
10   in this case?

11        A.    No.

12                       *   *   *

13        Q. [cross-examination]    Mr. Ohlson, you were first admitted to
    practice law in what year?

14        A.    1972.

15        Q.    And you have been mostly involved in criminal defense
16   in that time?

17        A.    That's right.

          Q.    Since 1972 have you ever had a case where an issue of
18   consent to search was tried to a jury?

19        A.    No.

20        Q.    Have you ever told any client that the issue of consent to
21   search would be tried to a jury?

22        A.    No.

23        Q.    Can you imagine why anyone would say such a thing?

24        A.    Incompetence.

25        Q.    And are you incompetent?

26        A.    You might—

27        Q.    Sir, this is your chance.

28

A.    I guess that depends. At what? At practicing law, I don't think I am.

Q.    All right. Are you confident that you never told your client, Mr. Campbell, that the issue of consent to search could be tried to this jury in his case?

A.    Absolutely.

Q.    Okay. Did you tell him, or can you imagine why you would tell him that if a witness on the subject of consent was unavailable for trial that the judge would dismiss without a trial?

A.    Well, I can imagine circumstances when I might tell that to a client—

Q.    Okay.

A.    —depending on the witness.

Q.    How about this client?

A.    I don't recall ever saying that.

Q.    Okay. Why would you say that, that if a witness didn't show up that the judge would dismiss without a trial?

A.    I don't know. I don't think I would.

Q.    Okay. And in particular, if the witness that may or may not show up was Ms. Loftis, and her testimony concerned consent, can you imagine why you would tell a judge—a client that the judge would dismiss if she didn't show up?

A.    I think that—if that was in the context of the suppression hearing, then I think it would be a different story, yes.

Q.    Trial, sir.

A.    Trial, no.

Q.    No. Okay. And so, assuming you had plea bargain discussions with your client, would you have—did you tell him—are you confident you did not tell him that he should reject it, because if Ms. Loftis did not show up for trial the case would be dismissed?

A.    I did not tell Mr. Campbell to reject a plea offer. I don't tell clients to reject plea offers.

(*Id*. at 21-22, 25-27.)

Campbell, on the other hand, testified in a manner generally supporting his claim, and contrary to Ohlson's testimony; however, the state district court found Campbell's testimony to be unconvincing:

> . . . Mr. Campbell's testimony was not credible under the facts of this case. It was not consistent with other assertions he's made, and was not consistent even on the stand.

(*Id*. at 123.)

The state district court denied relief on the claim, ruling as follows:

> Ground (9) and Supplemental Petition Ground (9): Petitioner alleges ineffective assistance of counsel for trial counsel's advice to reject a plea deal. Specifically, Petitioner argues that Mr. Ohlson informed Petitioner of an offer from the State of 72–180 months with no habitual criminal designation, but suggested that he not take the deal and proceed to trial. Petitioner claims that Mr. Ohlson told him that they probably offered him the deal because they could not find Ms. Loftis. Petitioner also states that Mr. Ohlson told Petitioner that should the State not locate Ms. Loftis, the Court would most likely dismiss the charges. Petitioner claims he decided to proceed to trial based on this information and advice.
>
> In *Lafler v. Cooper*, the defendant was initially willing to plead guilty and accept the State's offer. However, he proceeded to trial when his counsel convinced him that the State would be unable to establish intent because the victim had been shot below the waist. [Footnote: *Lafler v. Cooper*, 566 U.S. 156, 132 S.Ct. 1376 (2012).] Here, unlike in *Lafler*, Mr. Ohlson did not actively convince his client to act in one way or another. During the evidentiary hearing Mr. Ohlson agreed that he informed Petitioner of the plea deal, but stated that he did not tell Petitioner to reject the offer. He testified he has never done such a thing. Mr. Ohlson stated that he only advises his clients, and would not have told his client to reject a plea deal and go to trial. He also adamantly denied suggesting that the Court would dismiss the charges against Petitioner if the State could not produce Ms. Loftis as a witness. Mr. Ohlson's testimony was trustworthy and credible, and the Court accepts as true his assertions regarding his communication with his client. Therefore, Mr. Ohlson's communication and advice to Petitioner did not fall below the objective standard of reasonableness and cause prejudice against Petitioner. Thus, Ground (9) is DENIED.

(ECF No. 50-6 at 10-11.)

On the appeal in the state habeas action, Campbell changed the focus of the claim somewhat, emphasizing his argument—which is not part of Ground 1 here—that counsel was ineffective for failing to explain "joint or constructive possession liability" to Campbell

in connection with the plea offer. Campbell did, though, include factual allegations and argument concerning the argument on which the claim is presented in this case in Ground 1. (ECF No. 51-7 at 22-23, 48-51.) The Nevada Supreme Court affirmed the denial of relief on the claim:

> . . . [A]ppellant argues that counsel failed to inform him that he could be convicted of trafficking on a theory of constructive possession. He asserts that had counsel done so, he would have accepted a favorable plea offer. We conclude that substantial evidence supports the district court's conclusion that appellant failed to demonstrate that counsel convinced him to reject the plea offer. An attorney who represented appellant before trial testified that he discussed appellant's proposed defense that he did not own the drugs and concluded that it was not viable under Nevada law or the evidence against appellant. Trial counsel testified that he would have communicated all plea offers to appellant, and appellant agreed that the offer had been communicated. Counsel did not tell appellant to reject the plea offer. To the extent that appellant's testimony contradicted that of his counsel, it was for the district court to assess the relative credibility of each witness, and that determination receives substantial deference on appeal. *See Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981). The district court did not err in denying this claim.

(ECF No. 51-12 at 3-4.)

As Campbell's claim in Ground 1 was adjudicated on its merits in state court, the claim is here subject to the deferential AEDPA standard of 28 U.S.C. § 2254(d). In determining whether a state court decision is "contrary to" or an "unreasonable application" of federal law, under section 2254(d), the federal court looks to the state courts' last reasoned decision. *Kennedy v. Lockyer*, 379 F.3d 1041, 1052 (9th Cir. 2004), *cert. denied*, 544 U.S. 992 (2005). The Nevada Supreme Court affirmed the denial of relief on this claim without discussion of the theory asserted by Campbell in the state district court or in Ground 1 in this Court—that Ohlson advised him the charges would be dismissed if Loftis was unavailable to testify at trial—so the Court looks to the reasoning of the state district court. After holding an evidentiary hearing, the state district court found that Ohlson "adamantly denied suggesting that the Court would dismiss the charges against Petitioner if the State could not produce Ms. Loftis as a witness," and that Ohlson "agreed that he informed Petitioner of the plea deal, but stated that he did not tell

Petitioner to reject the offer." These findings were not unreasonable given Ohlson's testimony, which the state district court found to be credible.

Campbell argues that Ohlson admitted that there may be instances where he would advise a client that a witness's unavailability to testify about the legality of a search might result in dismissal of charges. (ECF No. 90 at 12-13.) However, Ohlson distinguished between the unavailability of a witness at a suppression hearing and the unavailability of a witness at trial. (ECF No. 50-1 at 25-27 ("I think that—if that was in the context of the suppression hearing, then I think it would be a different story, yes").) In this case, the prosecution made the plea offer to Campbell *after* the suppression hearing. (ECF Nos. 44-14 (transcript of suppression hearing held October 6, 2011, with trial court denying motion to suppress), 48-1 at 157 (plea offer transmitted to Campbell's counsel October 10, 2011).) So, when Ohlson advised Campbell about the plea offer, the search had already been ruled legal and its fruits admissible. There was no suggestion in Ohlson's testimony that he might have advised Campbell that the charges would be dismissed if Loftis was unavailable to testify at *trial*. The state district court reasonably found that Ohlson did not mislead Campbell about the chances that the charges would be dismissed on account of Loftis' unavailability at trial, and that he did not lead Campbell, by any such misleading advice, to reject the plea offer. The court's factual findings were reasonable and the court correctly applied *Lafler v. Cooper*, 566 U.S. 156 (2012). (ECF No. 50-6 at 10-11.)

Giving the state courts' rulings the deference required by both § 2254(d) and *Strickland*, as it must, the Court determines that the state courts reasonably ruled that Ohlson's advice regarding the plea negotiations was not deficient.

The Court also determines that, at any rate, the state courts reasonably found that Campbell did not show that he was prejudiced by Ohlson's advice regarding the plea offer. "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must

demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012); *see also Lafler*, 566 U.S. at 163 ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice"); *Jones v. Wood*, 114 F.3d 1002, 1012 (9th Cir. 1997) ("In order to prove prejudice where counsel fails to inform the petitioner about a plea offer, the petitioner must prove there was a reasonable probability he would have accepted the offer"). A fair-minded argument can be made that the state courts were correct in concluding that Campbell did not show that he was led to reject the plea offer by any improper legal advice from Ohlson. *See Harrington*, 562 U.S. at 101.

In sum, the state courts' denial of relief on the claim in Ground 1 was not contrary to or an unreasonable application of *Strickland, Lafler*, or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence presented. The Court denies habeas corpus relief on Ground 1.

### 2.   Ground 2

In Ground 2, Campbell claims that his federal constitutional rights were violated on account of ineffective assistance of his trial counsel because counsel "fail[ed] to argue that Ms. Loftis did not voluntarily consent to sign the waiver that permitted the search of the apartment." (ECF No. 25 at 10.) Campbell explains this claim as follows:

> On December 2, 2010, Ashley Loftis, Mr. Campbell's then-girlfriend, checked into St. Mary's Hospital in Reno, Nevada, to detox from heroin. *See* 7/1/2011 Motion to Suppress [ECF No. 43-19]. Ms. Loftis, who was accompanied by her father, told hospital staff that Mr. Campbell had physically assaulted her during a domestic dispute. *Id*. at 3. After Reno Police arrived to speak with Ms. Loftis, she informed a detective Jennifer Garnett-Hanifan that there was a large quantity of illegal drugs in the apartment she shared with Mr. Campbell. *Id*. Ms. Loftis then signed a permission to search form while detoxing from heroin and while taking Ativan—a benzodiazepine—and Clonidine to treat her withdrawal symptoms. *Id*.; *see also* Pet. Ex. 6 (filed under seal) (medical records of Ashley Loftis) [ECF No. 27-1].
>
> Pursuant to Detective Garnett-Hanifan's instructions, Ms. Loftis then called Mr. Campbell, asking that he meet her at her parents' house. *See* 7/01/2011 Motion to Suppress at 3. Mr. Campbell then came out of their

shared apartment, where law enforcement arrested him on an unrelated warrant. *See* 7/1/2011 Motion to Suppress; *see also* 10/6/2011 Motion to Suppress Hearing Transcript [ECF No. 44-14]. In doing so, the police removed the key chain from around Campbell's neck, took the key to the apartment, and entered the apartment based upon Ms. Loftis's signed consent form. *Id.* at 3–4; *see* 12/3/2010 Arrest Report and Declaration of Probable Cause [ECF No. 4-1, pp. 123–32]. They did not ask for Mr. Campbell's permission to search the apartment or inform him they planned to do so. See 10/6/2011 Transcript at 26. In that apartment, law enforcement found the narcotics that led to the trafficking charges contained in the Washoe County District Attorney's two-count Information. *See* 1/21/2011 Information [ECF No. 43-6].

Defense counsel John Malone moved to suppress, arguing only that the narcotics should be excluded because (1) the police failed to obtain a warrant to search the apartment and (2) Mr. Campbell, a co-tenant, did not consent to the search of the apartment. *See* 7/1/2011 Motion to Suppress. In a subsequently filed in proper person motion, Campbell raised the issue of Ms. Loftis's lack of consent to the search given that she was under the influence of drugs at the time she signed the permission to search form, thereby rendering her consent involuntary. *See* 7/13/2011 Pro Per Motion to Suppress Evidence [ECF No. 43-21]. In support of his motion, Mr. Campbell attached an affidavit from Ms. Loftis, dated February 24, 2011. *Id.* The court found these to be fugitive documents and did not consider them. *See* 10/06/2011 Pretrial Motions Hearing Transcript at 5.

After requesting new counsel, John Ohlson replaced John Malone; Ohlson then filed a reply in support of the motion to suppress. *See* 9/28/2011 Reply in Support of Motion to Suppress [ECF No. 44-12]. Although counselor Malone's motion to suppress did not raise the issue of voluntariness, Mr. Campbell filed an in pro per motion raising the issue of Ms. Loftis's voluntariness in consenting to the search, which counselor Ohlson then reiterated in his reply. *See* 7/13/2011 Pro Per Motion to Suppress Evidence; *see also* 9/28/2011 Reply in Support of Motion to Suppress. At the hearing on the motion to suppress, the State attempted to raise the issue of whether Ms. Loftis's consent to the search was voluntary—as raised in Mr. Campbell's in pro per motion and the reply—but Ohlson objected, indicating that Ms. Loftis's "state of mind [wa]s not in issue in th[e] case," and specifically withdrew any issue of voluntariness that may have been raised by Mr. Campbell in his proper person motion or counselor Ohlson's reply. *See* 10/6/2011 Hearing Transcript at 39. Yet, Ms. Loftis's signature on the consent to search form that she provided during her stay at St. Mary's, as well as the signature on her medical records, was inconsistent with the signature on the lease agreement for the apartment she co-leased with Mr. Campbell. *Compare* Pet. Ex. 6 & 10/10/2014 Pro Per State Petition, Ex. 12.5 *with* 10/10/2014 Pro Per State Petition [ECF No. 48-1].

During the state post-conviction evidentiary hearing, it became clear that both Malone and Ohlson were ineffective by failing to argue that Ms. Loftis's consent to search the apartment was involuntary. The medical records of Loftis were admitted at the post-conviction evidentiary hearing. *See* Pet. Ex. 6 (filed under seal). Those records establish she had used heroin the morning she signed the Consent to Search form yet was having

withdrawal symptoms and that medical personnel prescribed Ativan and Clonidine to control her narcotic withdrawal symptoms. She admitted to hospital staff that she was having suicidal thoughts and had been thinking about hanging herself, poisoning herself with carbon monoxide, shooting herself, or laying on railroad tracks to be hit by train. She also admitted she had smoked heroin daily for the past year, and hospital personnel noted that her thought process was "bizarre." She also indicated that she was hearing voices telling her to physically harm herself. These medical records were in Ohlson's file but never used for purposes of the motion to suppress.

Counsel was ineffective for failing to challenge the voluntariness of Loftis's consent to search. The medical records raise serious questions as to Loftis's state of mind at the time she gave consent to search the apartment. Further evidence of Loftis's unfocused state of mind was her sloppy signature on the consent form and in her medical records, which did not match the signature on the apartment lease form. The altered signature is consistent with someone who is suffering with a disorganized state of mind. Counsel had these records but waived the argument, which was clearly a deficient performance. This deficient performance ultimately prejudiced Campbell—had counsel raised this meritorious issue at the hearing, there is a reasonable probability the motion to suppress would have been granted and the charges against Mr. Campbell dismissed.

(*Id*. at 10-13.)

Campbell asserted this claim in state court in Ground 7 of his state habeas petition. (ECF No. 49-14 at 6-10.) After the evidentiary hearing (ECF No. 50-1 (Transcript)), the state district court denied relief on the claim, ruling as follows:

Ground (7) and Supplemental Petition Ground (7): Petitioner alleges ineffective assistance of counsel for trial counsel, John Ohlson's ("Mr. Ohlson"), failure to challenge the lawful nature of Ms. Loftis' consent to search. Mr. Malone, before being replaced by Mr. Ohlson, wrote and filed a Motion to Suppress that requested the Court suppress the evidence seized from the apartment Petitioner shared with Ms. Loftis because Petitioner objected to the search at the time of arrest. Petitioner did not agree with Mr. Malone that his objection to the search was the ground for which the evidence should be suppressed and subsequently filed a pro per motion to suppress. Petitioner's pro se motion argued that Ms. Loftis' consent to search was not given freely and voluntarily. Petitioner claims that Mr. Ohlson's failure to incorporate Petitioner's motion to suppress at the suppression hearing was ineffective assistance of counsel. Petitioner claims that because the Court sustained a hearsay objection regarding one of Ms. Loftis' statements, and offered a continuance to counsel to prepare according to the subsequent motion, those actions amount to evidence that the Court would have ruled in Petitioner's favor had counsel incorporated his pro se motion. However, the actions identified do not support the inferences the Petitioner now seeks to draw in hindsight. It appears that Petitioner is looking back over every step made by his counsel and trying to find an alternative action as a wooden means of asserting error.

> "Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

[Footnote: *Strickland v. Washington*, 466 U.S. 668, 669 (1984).]

> The "failure" of Mr. Ohlson to incorporate Petitioner's pro se motion must be viewed from Mr. Ohlson's perspective at the time. At the evidentiary hearing Mr. Ohlson testified that he did not incorporate Petitioner's motion because he felt as though the initial argument was much more likely to win. Although Petitioner argues to the contrary, there is no evidence to support the assertion that Ms. Loftis' consent was involuntary. In fact the overwhelming evidence is that he sought to pressure her, after the fact, to "take the fall" for his criminal misconduct.

> Thus, the "failure" by Mr. Ohlson to incorporate Petitioner's pro se motion to suppress into his arguments did not fall below an objective standard of reasonableness and cause prejudice against Petitioner. Trial counsel is permitted to develop their own strategy, and do not have to follow the lead charted by their clients. There is no evidence that had Mr. Ohlson incorporated Petitioner's motion that the outcome of the suppression hearing and subsequent trial would have been any different and Ground (7) is DENIED.

(ECF No. 50-6 at 8-9.) Campbell then asserted the claim on the appeal in his state habeas action. (ECF No. 51-7 at 28-34.) The Nevada Supreme Court affirmed the denial of relief on the claim, ruling as follows:

> . . . [A]ppellant argues that counsel should have challenged Ashley Loftis' consent to the search of the apartment she shared with appellant because she was under the influence of drugs when the police obtained her consent. We conclude that appellant failed to demonstrate deficient performance. Medical records showed that Loftis had used drugs before police sought her consent to search the apartment she shared with appellant. However, neither the transcript of the motion to suppress nor the testimony at the evidentiary hearing demonstrated that she was so intoxicated as to render her consent involuntary. *See McMorran v. State*, 118 Nev. 379, 383, 46 P.3d 81, 83 (2002) ("A search pursuant to consent is constitutionally permissible if the State demonstrates that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." (internal quotation marks omitted)). Therefore, the district court did not err in denying this claim.

(ECF No. 51-12 at 2-3.)

Because the claim in Ground 2 was adjudicated on its merits in state court, the Court applies the AEDPA standard.

Voluntary consent to a search allows the State to conduct a warrantless search that would otherwise be prohibited under the Fourth and Fourteenth Amendments. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). To determine whether consent to search is voluntarily given under the Fourth Amendment, a court must look at the totality of all the circumstances. *See id*. at 221.

The Court determines that, in light of the evidence presented in state court, the Nevada Supreme Court's ruling on the claim in Ground 2 was a reasonable application of *Strickland* and *Schneckloth*.

Campbell's counsel—John Malone, who filed the initial motion to suppress for Campbell—testified at the evidentiary hearing that he made a deliberate choice not to argue that Loftis's consent was involuntary:

> Q. [direct examination]    Okay. Did you ever make the argument in that motion to suppress that she [Loftis] couldn't consent because she was under the influence or on drugs at the time of the consent?
>
> A.    No.
>
> Q.    Why not?
>
> A.    There are lots of different reasons. Okay? I had, I believe, a very strong motion under *Randolph*, *Georgia v. Randolph*, that second-party consent and the ability of the co-tenant to vitiate consent. In other words, if the cotenant were—under *Randolph* if the co-tenant were on the scene and said, "I don't want you to search," they would have—they would not be able to search given the first party co-tenant's consent. Was that clear enough?
>
> Q.    Yes. But you're also familiar that people, if they're in an intoxicated state, there's an argument that can be made that they cannot consent, in your history as a lawyer; correct?
>
> A.    That's not exactly correct.
>
> Q.    Okay.
>
> A.    I mean—
>
> Q.    That there may be issues surrounding their consent if they're intoxicated or under the influence? Do we agree on that?

A.      Certainly there could be an issue.

Q.      Okay. And you said there were several reasons. You noted the first, that you thought your issue was strong. What were the other reasons that you didn't raise the issue for intoxication or being under the influence as relative to her consent?

A.      I had about—I had reports, numerous reports, of Mr. Campbell contacting Ms. Loftis while he was at the Washoe County Jail. He did so using another inmate's PIN number, personal identification number, but the phone calls were attributed to him. And they were, I would say devastating to his case in lots of ways.

Q.      Okay.

A.      He was—the clear content and import of those phone calls was to persuade Ms. Loftis to testify in a manner favorable to him. It alternated between: Testify that you didn't give them consent, that you were forced into it, that you were badgered into it, and then it went on to asking her to take responsibility for the drugs. So—

Q.      And you had a copy of these phone calls?

A.      Yeah. Well, I had a—I had copies of the phone calls. I had—and I had reports that documented each and every call and the substance of the call. Some calls, in other words, that the—that Reno Police Department—I believe it was Reno—the Reno Police Department monitored, they reported as not having any bearing on his case. But there were, I believe, right around 30 that did.

Q.      And you felt that if you opened that door, the State would be able to use those calls?

A.      Yes. I mean, I'm a—you know, those were, in my opinion, a huge problem.

                    *     *     *

Q. [cross-examination]      Have you ever seen a judge rule that simply being under the influence of marijuana precludes consent?

A.      No. That—as stated, no.

Q.      If you were to evaluate the question of whether that position should be advanced, how would you—how would you rate it?

A.      Desperate.

Q.      Okay. And—

A.      Can I expand?

Q.      Yeah. Please do. Go ahead.

1    A.    Unwilling to—unlikely to succeed, a desperate move, a pretty
tough bar to pass.

2

3    Q.    Okay. Now, how about having a history of drug use? Does
that preclude consent?

4    A.    No.

5    Q.    How about having unspecified mental illness or mental
problems? Does that conclude—excuse me. Does that preclude a consent?

6

7    A.    No.

8    Q.    You know that you can advance more than one argument in a
motion?

9    A.    Yes.

10   Q.    So why not throw in all the—the ones you don't like, too?

11   A.    There's a quote by Sun Tzu, the Chinese general, strategist,
tactician, who says that—and that quote is, an attack—an attack
12   everywhere is an attack nowhere. So—and I think when you're talking about
military strategy or trial strategy, the concept of concentrating your forces
13   on the opposition's weakest point is well settled to be the best way to win
that battle.

14

15   (ECF No. 50-1 at 99-101, 114-15.)

16   Ohlson also testified that he made a strategic decision about what arguments to

17   make in support of the motion to suppress:

18   Q. [cross-examination]    Okay. Now, you had a strategy for the
suppression hearing; correct?

19

20   A.    I'm sure.

21   Q.    You don't remember exactly what it was, though; right?

22   A.    Right.

23   Q.    Okay. How do you—how do you formulate a strategy for a
suppression hearing? What did you do to prepare?

24   A.    You have to work within the parameters of the facts and the
law.

25

26   Q.    Okay. So you evaluate the strength of legal principles and the
strength of your facts?

27   A.    That's right.

28

Q.    Okay. Did you do that in this case?

A.    I assume so, yes.

Q.    Okay. There may have been other strategies around.

A.    I don't think there's any other strategy than to evaluate the facts and the law.

Q.    Okay. All right. That sounds about right.

Did you consider bringing in other witnesses to the suppression hearing, specifically Ms. Loftis?

A.    I don't recall. I don't think I would have brought Ms. Loftis to a hearing. I don't recall.

Q.    Why not?

A.    She was the State's witness.

Q.    Okay. You didn't anticipate she would be helpful?

A.    I did not anticipate that she would be helpful, no.

Q.    Okay.

A.    As I recall, she may have made some expressions that she was willing to be helpful, but I—I would have been–I would have been skeptical about them.

Q.    All right.

(*Id*. at 27-28.)

It appears, from the testimony of counsel that they made a deliberate, strategic decision not to assert an argument that Loftis's intoxication or mental state precluded her voluntary consent to the search, primarily, perhaps, because they wanted to avoid opening the door to what would have been damaging testimony by Loftis about Campbell's telephone calls with her.

Moreover, there was evidence supporting the conclusion that Loftis was not so intoxicated as to render her consent involuntary, and that there was no coercion by the police. For example, Detective Garnett-Hanifan testified as follows at the hearing on Campbell's pretrial motion to suppress:

Q. [direct examination]    Where did you meet with Ms. Loftis?

A.    In the emergency room of St. Mary's [Hospital].

Q.    What was her physical condition at the time?

A.    Apparently normal.

Q.    She didn't appear to be in traction or anything like that?

A.    No.

Q.    What was her mental demeanor at the time from what you could tell in speaking with her?

A.    She was fine. She was being medically cleared to go into a treatment center.

Q.    Did she appear to be under the influence of drugs or alcohol at that time?

A.    No.

Q.    Did she—was she able to converse with you coherently?

A.    Yes.

(ECF No. 44-14 at 38-39.)

The Court therefore determines that a fair-minded argument can be made that Campbell's counsel did not perform unreasonably in not making an argument that Loftis did not voluntarily consent to the search, and that, at any rate, Campbell was not prejudiced by his counsel not making such an argument. The Nevada Supreme Court's ruling on the claim in Ground 2 was not contrary to or an unreasonable application of *Strickland, Schneckloth*, or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court. The Court denies Campbell habeas corpus relief on Ground 2.

**3.    Ground 3**

In Ground 3, Campbell claims that his federal constitutional rights were violated on account of ineffective assistance of his trial counsel because counsel "failed to make an *Apprendi* objection to the enhanced sentence beyond the one justified by the jury's

verdict." (ECF No. 25 at 13.) Campbell explains that he was convicted of two counts of trafficking in a controlled substance, in violation of NRS § 453.3385(3)—one count for trafficking cocaine and one count for trafficking heroin—and that his sentence turned upon the amount of each substance involved:

> The statute provided for three levels of punishment based on the quantity of drugs. Under subsection 1, if the quantity is 4 grams or more, but less than 14 grams, the person would be convicted of a class B felony and sentenced to imprisonment for a minimum term of not less than 1 year and a maximum term of not more than 6 years and a fine of not more than $50,000. NRS § 453.3385(1) (2011). Under subsection 2, if the quantity is 14 grams or more, but less than 28 grams, the person would be convicted of a class B felony and sentenced to imprisonment for a minimum term of not less than 2 years and a maximum term of not more than 15 years and by a fine or not more than $100,000. NRS § 453.3385(2) (2011). Under subsection 3, if the quantity of drugs is 28 grams or more, the person would be convicted of class A felony and sentenced either to life with the possibility of parole after 10 years or a definite term of 10 to 25, and by a fine of not more than $500,000. NRS § 453.3385(3) (2011).

(*Id*. at 14.) According to Campbell, "[t]he weight of the recovered substances in the apartment shared by Mr. Campbell and Ms. Loftis was a contested fact at trial;" specifically, he argues that only small portions of the substances recovered at his residence were actually tested to determine what they were, and, therefore, he argues, the prosecution did not prove that there was more than 28 grams of cocaine or heroin. (*Id*. at 14-15.) Campbell continues:

> While Campbell was charged in the information under subsection 3, which required a finding of 28 or more grams, the jury was not instructed to make the necessary finding to justify a conviction and sentence under that subsection. Rather, the jury was charged to find only the quantity that justified a conviction and sentence under subsection 1, namely four or more grams.
>
> *      *      *
>
> Although the jury only made a specific finding that Campbell possessed at least four grams, the court sentenced Campbell under subsection 3 to a term of 10 to life on each count to run consecutively as a class A felony based on possession of 28 or more grams of each drug. *See* 2/24/2012 Sentencing Transcript [ECF No. 46-7] at 15. However, there was no specific factual finding from the jury that Campbell possessed 28 or more grams to justify that enhanced sentence.

The imposition of this sentence was clearly erroneous as it violated Campbell's rights to due process and a jury trial under *Apprendi* and its progeny. Under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. The "maximum sentence" under *Apprendi* is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. *Blakely v. Washington*, 542 U.S. 296, 303 (2004).

\*   \*   \*

Counsel did not object to the imposition of this unconstitutional sentence. This was clearly deficient performance. *Apprendi* was well-settled law at the time of the sentencing. There was no justification for failing to object to any sentence above the jury's only specific finding of at least 4 grams. This deficient performance prejudiced Campbell. Had counsel objected, there is more than a reasonable probability the outcome would have been different. Had this issue been raised, the court would have been constitutionally required to impose only that sentence that was justified based on the jury's verdict, namely a sentence under NRS § 453.3385(1) as a class B felony to a minimum term of not less than 1 year and a maximum term of not more than 6 years.

(*Id*. at 15-16.)

Campbell did not assert this claim in his petition or his supplemental petition in his state habeas action. (ECF Nos. 48-1, 49-14.) After appointment of new counsel for the appeal in that action, Campbell did assert this claim on the appeal. (ECF No. 51-7 at 52-57.) However, because Campbell had not raised the claim in the state district court, the Nevada Supreme Court declined to consider the claim on appeal:

.  .  . [A]ppellant argues that trial and appellate counsel were ineffective as to the sentencing hearing and not challenging the sentence on appeal based on inadequate jury instruction. Appellant did not raise this claim in his petition and we decline to consider it for the first time on appeal. *See McNelton v. State*, 115 Nev. 396, 416, 990 P.2d 1263, 1276 (1999).

(ECF No. 51-12 at 4.) Therefore, the Nevada Supreme Court applied a state law procedural bar and declined to consider the claim on its merits, and the claim is subject to application of the procedural default doctrine in this case. Campbell seeks to overcome the procedural default by showing, under *Martinez*, that his state post-conviction counsel was ineffective for not asserting the claim in the state district court in his state habeas action.

Campbell acknowledges that he "was charged in an information with two counts of trafficking in a controlled substance in violation of NRS § 453.3385(3)" and that "Count One charged Campbell with possessing 28 grams of cocaine and Court Two charged him with possessing 28 grams of heroin." (ECF Nos. 25 at 13, 51-12 at 15.) This was spelled out in the information. (ECF No. 43-6 at 2-3.)

However, as Campbell points out, Jury Instruction No. 17, stated:

> The crime of trafficking in a controlled substance consists of the following elements:

>> (1) A person willfully, unlawfully, knowingly and/or intentionally

>> (2) Sells, manufactures, delivers or brings into this state

> Or

>> (3) Is in actual or constructive possession of any controlled substance listed in schedule I, except marijuana, or any mixture which contains any such controlled substance

>> (4) In a quantity of four grams or more

> For a person to be convicted of Trafficking in a Controlled Substance under NRS 453.3385, it is not necessary there be additional evidence of any activity beyond the possession of a quantity of controlled substance equal to or greater than four grams.

> Heroin and Cocaine are Schedule I controlled substances.

(ECF Nos. 25 at 15-16, 46-4 at 19.)

In *Apprendi v. New Jersey*, the defendant was charged with various shootings and possession of weapons. 530 U.S. 466, 469 (2000). The indictment did not charge a violation of the state hate crime statute, nor did it allege the defendant acted with a racially biased purpose. *See id*. The defendant entered a guilty plea agreement that reserved the right for the prosecution to argue for a higher "enhanced" sentence based on the offense being committed with a biased purpose. *See id*. at 469-70. Following an evidentiary hearing, the trial court found the state hate crime statute applied and sentenced the defendant based on that statute. *See id*. at 470-71. The sentence imposed was greater

than the sentence range for the offense charged in the indictment. *See id*. at 476. The Supreme Court reversed, holding that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *See id*. at 490-92. Because the prosecution did not charge the defendant under the hate crime statute, the sentence went beyond the statutory maximum for the crimes that were actually charged. *See id*.

In this case, in contrast, Campbell was charged in the information with violation of NRS § 453.3385(3), that is, with possession of 28 or more grams of cocaine, and possession of 28 or more grams of heroin. (ECF No. 43-6 at 2-3.) There is no question that he was sentenced within the range of sentences prescribed by statute for those crimes at the time.

Moreover, while Jury Instruction No. 17 stated that violation of NRS § 453.3385, generally, required possession of four grams or more of a controlled substance, the jury instructions also correctly stated the specific charges contained in the information. (ECF No. 46-4 at 3.) One of the first instructions given to the jury, Jury Instruction No. 2, stated:

> The defendant in this matter, JERMAINE JAMICA CAMPBELL, is being tried upon an Information which was filed on the 21st day of January, 2011, in the Second Judicial District Court, charging the said defendant, JERMAINE JAMICA CAMPBELL, with:
>
> COUNT I. TRAFFICKING IN A CONTROLLED SUBSTANCE, a violation of NRS 453.3385(3), a felony, (F1050) in the manner following:
>
> That the said defendant on the 3rd day of December A.D., 2010, or thereabout, and before the filing of this Information, at and within the County of Washoe, State of Nevada, did willfully, unlawfully, knowingly, and/or intentionally, sell, manufacture, deliver, or be in actual or constructive possession of 28 grams or more of a Schedule I controlled substance or a mixture which contains a Schedule I controlled substance, to wit: cocaine at Reno, Washoe County, Nevada.
>
> COUNT II. TRAFFICKING IN A CONTROLLED SUBSTANCE, a violation of NRS 453.3385(3), a felony, (Fl050) in the manner following:
>
> That the said defendant on the 3rd day of December A.D., 2010, or thereabout, and before the filing of this Information, at and within the County of Washoe, State of Nevada, did willfully, unlawfully, knowingly, and/or intentionally, sell, manufacture, deliver, or be in actual or constructive possession of 28 grams or more of a Schedule I controlled substance or a

mixture which contains a Schedule I controlled ·substance, to wit: heroin at Reno, Washoe County, Nevada.

(*Id*.) Jury Instruction No. 21 stated, in part:

Each count charges a separate and distinct offense. You must decide each count separately on the evidence and the law applicable to it, uninfluenced by your decision as to any other count.
(*Id*. at 23.) Jury Instruction No. 23 stated:

Unlawful possession for sale is the unlawful possession by a person for the purpose of sale of any controlled substance, or a mixture containing a controlled substance.

(*Id*. at 25.) And Jury Instruction No. 4 stated, in part:

[Y]ou are not to single out any certain sentence, or any individual point or instruction, and ignore the others, but you are to consider all the instructions as a whole and to regard each in the light of all the others.

(*Id*. at 6.)

In the closing argument, the prosecution made the following argument, accurately reflecting the instructions given to the jury:

The law is clear on that trafficking count, I don't have to prove he's a drug dealer. I just have to prove he had constructive or actual possession of drugs or a mixture containing those drugs *in excess of 28 grams in this case*. He did. And I'm not telling you that because that's what I want you to believe. I'm telling you that, because that's what the evidence is beyond a reasonable doubt. Yes, it's a high burden, absolutely, one we embrace, one we work with every day over here. It's one that is used in courts throughout this country to convict people of crimes of everything from traffic tickets on up to murder. It's the same standard of proof.

(ECF No. 46-2 at 149-50 (emphasis added).)

The jury's verdicts on Counts 1 and 2 were as follows:

We the jury, being duly empaneled in Count I of the above entitled matter do find . . . The defendant, guilty of trafficking in a controlled substance.

*   *   *

We the jury, being duly empanelled in Count II of the above entitled matter do find . . . The defendant, guilty of trafficking in a controlled substance.

(ECF No. 46-3 at 3-4.)

Campbell was charged with possessing, and therefore, under Nevada law, trafficking, 28 or more grams of cocaine and 28 or more grams of heroin. The jury found him guilty of those crimes, and the court sentenced him within the range of sentences prescribed by statute for those crimes at the time of Campbell's trial. It was not unreasonable for Campbell's trial counsel not to make an objection based on *Apprendi*, and Campbell was not prejudiced by his counsel not doing so. The Court determines that the claim of ineffective assistance of trial counsel in Ground 3 is not substantial. Campbell does not show his state post-conviction counsel to have been ineffective for not asserting this claim. Campbell does not overcome the procedural default of the claim under *Martinez*. The claim in Ground 3 is denied as procedurally defaulted.

### 4. Ground 4A

In Ground 4A, Campbell claims that his federal constitutional rights were violated on account of ineffective assistance of his trial counsel because his counsel was ineffective at sentencing for "failing to make any argument on behalf of Mr. Campbell." (ECF No. 25 at 18.)

Campbell did not assert this claim in his petition, or in his supplement to the petition, in his state habeas action. (ECF Nos. 48-1, 49-14.) Campbell did assert this claim on the appeal in his state habeas action. (ECF No. 51-7 at 13, 24, 36-38, 42.) However, because Campbell did not raise the claim in the state district court, the Nevada Supreme Court declined to consider the claim on its merits on the appeal. (ECF No. 51-12 at 4.) The Nevada Supreme Court applied a state law procedural bar to the claim. Therefore, the claim is subject to application of the procedural default doctrine in this case. Campbell seeks to overcome the procedural default by showing, under *Martinez*, that his state post-conviction counsel was ineffective for not asserting this claim of ineffective assistance of trial counsel in Campbell's state habeas action.

At the sentencing hearing, Campbell's trial counsel, John Ohlson, initially made no argument regarding the sentence to be imposed, but rather, informed the court that

1    Campbell had a statement he wished to read to the court. (ECF No. 46-7 at 6.) The State

2    then argued for the sentence recommended by the Department of Parole and Probation,

3    which was a term of life in prison with parole eligibility after ten years on each count, with

4    the two sentences running concurrently. (*Id*. at 6-8.) Campbell then gave his statement.

5    (*Id*. at 8-12.) After hearing from Campbell, the court stated that it would impose sentences

6    of life in prison with parole eligibility after ten years on each count, with the sentences to

7    be served consecutively, and the court stated its reasons for doing so. (*Id*. at 12-16.) At

8    that point, Ohlson stated:

9            Parole and probation recommended a concurrency between the two
             sentences I think because the transaction was basically one transaction. It
10           wasn't a sale or hand-to-hand sale. It was quantity found in the search of
             the house in one specific transaction. I request that you follow that
11           recommendation and amend your sentence.

12   (*Id*. at 16.) The court denied that request. (*Id*. at 17.)

13           Respondents point out that Ohlson did, in fact, advocate for Campbell at

14   sentencing. At an earlier hearing, Ohlson informed the court that Campbell requested

15   corrections to the pre-sentence investigation report and asked that Campbell be allowed

16   to explain; that resulted in the sentencing being continued to allow for further investigation

17   and corrections. (ECF Nos. 46-6, 75 at 19.) And, at the continued sentencing hearing,

18   Ohlson argued for further corrections to the pre-sentence investigation report. (ECF Nos.

19   46-7 at 4-5, 75 at 19.) Respondents also note that Ohlson made the request for concurrent

20   sentences. (ECF Nos. 46-7 at 16, 75 at 19.) Most importantly, though, Respondents argue

21   that Campbell does not specify any argument Ohlson should have made that might have

22   resulted in a lesser sentence. (ECF No. 75 at 19-20.)

23           The Court determines that Campbell does not show that there was any argument

24   that his trial counsel could have made, beyond the arguments he did make, that would

25   have raised any possibility of a lesser sentence. In light of the evidence presented at trial,

26   Campbell's criminal history, and the sentencing court's explanation for imposing the

27   sentence it did, and without any showing by Campbell what further argument his trial

28

counsel could have made to change the outcome, the Court finds this claim of ineffective assistance of trial counsel to be insubstantial. Campbell does not show his state post-conviction counsel to have been ineffective for not asserting this claim. Campbell does not overcome the procedural default of the claim under *Martinez*. The claim in Ground 4A is denied as procedurally defaulted.

### 5.    Ground 4B

In Ground 4B, Campbell claims that his federal constitutional rights were violated on account of ineffective assistance of his trial counsel because counsel was ineffective at sentencing for "failing to object to suspect evidence cited by the judge in imposing two life sentences." (ECF No. 25 at 19.) More specifically, Campbell claims:

> At sentencing, the court heard from Mr. Campbell and then highlighted its considerations in imposing two life sentences. [*See* ECF No. 46-7 at 12–16.) The court highlighted his consideration of the uncharged and disputed bad act of domestic violence against Ms. Loftis, which Mr. Campbell—not his counsel—objected to. [*Id*. at 13.] The Court then relied upon charges from other jurisdictions that were ultimately dismissed and the fact that Mr. Campbell had 11 children by 8 different women to support the court's position that Mr. Campbell was a danger to the community. [*Id*. at 15.] Counselor Ohlson did not object to the Court's reliance on any of this evidence.

(*Id*. at 19-20.)

Campbell did not assert this claim in his petition, or in his supplement to the petition, in his state habeas action. (ECF Nos. 48-1, 49-14.) Campbell did assert this claim on the appeal in his state habeas action. (ECF No. 51-7 at 13, 25, 34-43.) However, because Campbell did not raise the claim in the state district court, the Nevada Supreme Court declined to consider the claim on its merits on the appeal. (ECF No. 51-12 at 4.) The Nevada Supreme Court applied a state law procedural bar to the claim. Therefore, the claim is subject to application of the procedural default doctrine in this case. Campbell seeks to overcome the procedural default by showing, under *Martinez*, that his state post-conviction counsel was ineffective for not asserting this claim of ineffective assistance of trial counsel in Campbell's state habeas action. The Court, however, finds insubstantial

Campbell's claim that that his counsel was ineffective for not objecting to the sentencing court's reliance upon the alleged improper evidence.

Campbell states in his claim that the sentencing judge "highlighted his consideration of the uncharged and disputed bad act of domestic violence against Ms. Loftis, which Mr. Campbell—not his counsel—objected to." (ECF No. 25 at 19-20.) However, after Campbell objected, asserting that Loftis went to the hospital, not for injuries caused by Campbell, but for drug rehabilitation, the sentencing judge stated:

> That's right. That's right. She was. You're right. So I'll take that back. I won't hold you for that.

(ECF No. 46-7 at 13.)

Campbell points out that the sentencing judge mentioned "the fact that Mr. Campbell had 11 children by 8 different women." (ECF Nos. 25 at 20, 46-7 at 15.) Campbell does not claim this was untrue; he refers to it as a "fact." It was Campbell, himself, who first mentioned this at the sentencing hearing. (ECF No. 46-7 at 9 ("Your Honor, I have 11 kids by eight different women").) Campbell does not make any showing that the judge's mention of this in explaining the sentence was improper or objectionable.

Also, according to Campbell, the sentencing judge "relied upon charges from other jurisdictions that were ultimately dismissed." (ECF No. 25 at 20.) However, the sentencing judge described those as "contacts . . . with law enforcement." (ECF No. 46-7 at 15.) The judge stated, referring to the presentence investigation report, "[i]t says the defendant was also arrested for the following offenses, *dispositions as noted*." (*Id*. (emphasis added).) The judge appears to have been aware that Campbell's contacts with law enforcement did not necessarily result in convictions, and he made clear that he relied upon only the information provided in the presentence investigation report. Campbell makes no showing that the judge relied upon any misinformation, or "suspect evidence."

In short, Campbell does not make any showing that his counsel performed deficiently in not objecting to the sentencing court's consideration of any of the matters

he describes, or any showing that, had his counsel objected, the outcome of the sentencing would have been different. Campbell does not show his state post-conviction counsel to have been ineffective for not asserting this claim. Campbell does not overcome the procedural default of the claim under *Martinez*. The claim in Ground 4B is denied as procedurally defaulted.

### E.   Certificate of Appealability

For a certificate of appealability ("COA") to issue, a habeas petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). Additionally, where the district court denies a habeas claim on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.; *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). Applying these standards, the Court finds that a certificate of appealability is unwarranted.

## IV.   CONCLUSION

It is therefore ordered that Campbell's Amended Petition for Writ of Habeas Corpus (ECF No. 25) is denied.

It is further ordered that Campbell is denied a certificate of appealability.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 16th Day of June 2023.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE